United States District Court
Southern District of Texas
**ENTERED**
May 24, 2022
Nathan Ochsner, Clerk

# In the United States District Court for the Southern District of Texas

## GALVESTON DIVISION

No. 3:21-cv-122

CHARLES SHEFFIELD, ET AL., *PLAINTIFFS*,

v.

GEORGE P. BUSH, *DEFENDANT*.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

Enacted in 1959, the Texas Open Beaches Act protects access to Texas beaches, particularly where the public has acquired an easement or right of use. Tex. Nat. Res. Code §§ 61.011(a), 61.013(a). In the summer of 2020, after two tropical storms obliterated the natural vegetation line in the Village of Surfside Beach, the Texas General Land Office (GLO) issued an order temporarily deeming the line of vegetation 200 feet inland from the mean low tide line. The plaintiffs, Charles Sheffield and Pedestrian Beach, LLC, homeowners of beachfront property in Surfside Beach, brought this action against the Commissioner of the GLO, George P. Bush, seeking a declaration that the order amounts to an unconstitutional taking, constitutes an

unreasonable seizure, and violates due process.

Pending before the court are two motions: the Commissioner's motion to dismiss and the homeowners' motion for a preliminary injunction to halt the enforcement of the order. *See* Dkts. 19, 16. After considering the pleadings, arguments, evidence, and relevant case law, the court grants in part and denies in part the Commissioner's motion to dismiss, and denies the homeowners' motion for preliminary injunction.

## I.   Background

### A. Texas Coastal Property Law

For the purposes of Texas coastal property law, the "mean low tide" (MLT) and the "mean high tide" (MHT) mark the average of low- and high-tide marks over a roughly 19-year period. *See Luttes v. State*, 324 S.W.2d 167, 174 (Tex. 1958). The area between the MLT and the MHT is called the "wet beach" because it is under tidal waters for at least some time each day. *Severance v. Patterson*, 370 S.W.3d 705, 714–15 (Tex. 2012). In Texas, the State owns the wet beach in trust for the public use. *Id.* at 717–18 (citing *Luttes*, 324 S.W.2d at 167, 191–92).

The area between the MHT and the natural "line of vegetation" (LOV) is called the "dry beach." *Id.* at 714. The State does not automatically hold title to all the dry beach. *Id.* at 710. These are often private lands to which the

State may obtain access for the public through easements established by "prescription or dedication," or where a right of public use exists "by virtue of continuous right in the public since time immemorial." *Id.* at 711 (quoting Tex. Nat. Res. Code §§ 61.011(a), 61.013(a)).

The Open Beaches Act (OBA) "does not create easements for public use along Texas Gulf-front beaches," *Severance*, 370 S.W3d at 714, but merely provides the State with a "means of enforcing public rights to use of state-owned beaches and of privately owned beach property where an easement is established in favor of the public." *Id.* at 710–11. A "public beach"—a term of art within the OBA—is defined as:

> any beach area, whether publicly or privately owned, extending inland from the line of mean low tide to the line of vegetation bordering on the Gulf of Mexico to which the public has acquired the right of use or easement to or over the area by prescription, dedication, presumption, or has retained a right by virtue of continuous right in the public since time immemorial, as recognized in law and custom.

Tex. Nat. Res. Code § 61.001(8). Thus, the Texas Legislature defines "public beach" by two criteria: physical location and right of use. *Severance*, 370 S.W.3d at 714. Accordingly, because much of the dry beach was given through land grants in the 1800s to private parties without the State retaining any right of access, the dry beach becomes part of the "public beach" only if a right to public use has been judicially established. *Id.* at 715.

### B. "Rolling Easements"

Tide lines and vegetation lines are not static. They are constantly changed by dynamic natural forces, both gradually and sometimes quite suddenly. In a landmark case issued a decade ago, *Severance v. Patterson*, the Supreme Court of Texas distinguished between the way in which gradual changes affect public beach easements, and how sudden changes affect them. 370 S.W.3d 705 (Tex. 2012). As tide lines and vegetation lines change over time, the public easements do, too. "They may shrink or expand gradually with the properties they encumber." *Id*. at 708. The *Severance* Court noted that the State need not "re-establish easements each time boundaries move due to gradual and imperceptible changes to the coastal landscape." *Id*.

The Court held, however, that abrupt changes, such as those caused by hurricanes and tropical storms, are different. "[W]hen a beachfront vegetation line is suddenly and dramatically pushed landward by acts of nature, an existing public easement does not 'roll' inland to other parts of the parcel or onto a new parcel of land." *Id*. "[W]hen land and the attached easement are swallowed by the Gulf of Mexico in an avulsive event, a new easement must be established by sufficient proof to encumber the newly created dry beach bordering the ocean." *Id*. In short, without a judicial determination that a public easement should encumber a portion of the dry

beach, the fact that the LOV changes does not automatically give the public a right of access to private land. This requirement, the Court noted, protects property owners' right to exclude—"one of the most treasured strands in an owner's bundle of property rights." *Id.* at 709 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435–36 (1982)).

But once a piece of land is properly designated as a "public beach," the OBA expressly prohibits efforts to exclude:

> No person may display or cause to be displayed on or adjacent to any public beach any sign, marker, or warning, or make or cause to be made any written or oral communication which states that the public beach is private property or represent in any other manner that the public does not have the right of access to the public beach as guaranteed by this subchapter.

Tex. Nat. Res. Code § 61.014(b).

After *Severance*, the Texas Legislature added § 61.0171 to the OBA.[1] It permits the Commissioner to, by order, "suspend action on conducting a line of vegetation determination for a period of up to three years from the date the order is issued if the Commissioner determines that the line of vegetation was obliterated as a result of a meteorological event." *Id.* § 61.0171(a). "For the duration of the order, the public beach shall extend to a line 200 feet

---

[1] Act of June 14, 2013, 83rd Leg., R.S., ch. 1086, § 61.0171, sec. 5, 2013 Tex. Gen. Laws 2589, 2591 (codified at Tex. Nat. Res. Code § 61.0171).

inland from the line of mean low tide as established by a licensed state land surveyor." *Id.* An order issued under this section is "filed for record by the land office in the real property records of the county in which the area of the beach subject to the order is located." *Id.* § 61.0171(b). "Following expiration of an order . . . the Commissioner shall make a determination regarding the line of vegetation," and this line "shall constitute the landward boundary of the area subject to public easement." *Id.* § 61.0171(f), (h).

### C. The 2021 Temporary Order

The plaintiffs Charles Sheffield and Pedestrian Beach, LLC (collectively, the "homeowners") own four beachfront parcels in the Village of Surfside Beach. Both Sheffield and Pedestrian Beach operate the properties as vacation-rental homes.

In the summer of 2020, Hurricane Laura and Tropical Storm Beta devastated the coastline in the Surfside Beach area. *See* Dkt. 16-4 at 1. In response to these events, on March 29, 2021, the Commissioner issued an order under § 61.0171 entitled, "Temporary Order Suspending Determination of the Line of Vegetation and Suspending Enforcement of Certain Encroachments on the Public Beach" (the "Order"). *Id.* The Order provides that for a period of two years, the "area from the MLT to 200 feet landward shall be the minimum public beach easement." *Id.* at 2. It also

suspends, for a period of three years, the removal of houses that may now be seaward of the new line of vegetation. *Id.* The Order states that designating this temporary LOV was necessary because the storms "obliterated" the natural LOV. *Id.* at 1. The Order notes that without an identifiable vegetation line, certain permits, such as for beachfront construction, cannot be issued. *Id.*

The homeowners filed this action after the Order issued, alleging causes of action under the Fifth Amendment's Takings Clause, the Fourth Amendment's Seizure Clause, and the Fourteenth Amendment's Due Process Clause. *See generally* Dkt. 1. Specifically, the homeowners argue that the Order appropriates a public-beach easement comprising all the land from the MLT line to 200 feet inland without first seeking a judicial determination that such an easement exists as *Severance* requires. *Id.* ¶ 53.

In their amended complaint, the homeowners seek a declaratory judgment under *Ex Parte Young* that (1) the Order effects an unconstitutional taking of private property facially and as-applied to the homeowners; (2) the Order effects an unreasonable seizure on its face and as-applied to the homeowners' land by imposing a public beach on their private land without prior compliance with *Severance*'s command that the State first obtain a judicial determination of an easement; (3) the Order

deprives the homeowners of real-property interests without notice or a hearing and, thus, without due process of law; and (4) the Order's placement of the public beach at a 200-foot line is arbitrary and irrational, and thus violates "substantive due process."[2] Dkt. 12 at 26–27. The homeowners seek a preliminary and permanent injunction enjoining the enforcement of the Order. *Id.*

## II.   Applicability of *Ex Parte Young*

The Eleventh Amendment affirms the fundamental principle that "sovereign immunity limits the grant of judicial authority in Article III." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984). And as a sovereign entity, a state may not be sued without its consent. *Id.* (quoting *Emps. of Dep't of Pub. Health & Welfare, Mo. v. Dep't of Pub. Health & Welfare, Mo.*, 411 U.S. 279, 280 (1973)). Seeing through any pretext, this principle correspondingly applies in suits against state officials when "the state is the real, substantial party in interest." *Id.* (quoting *Ford Motor Co. v. Dep't of Treasury of Ind.*, 323 U.S. 459, 464 (1945)). The Supreme Court has recognized, however, an important exception to this general rule: "a suit challenging the constitutionality of a state official's action is not one against

---

[2] The homeowners also raised an additional claim that § 61.019 of the Texas Natural Resources Code violates the Fifth Amendment, Texas law, and the Due Course of Law provision of the Texas Constitution. They have since abandoned this claim.

the State." *Id.*; *see Ex Parte Young*, 209 U.S. 123 (1908). *Ex Parte Young* stands for the proposition that an unconstitutional statute is "void" and therefore does not "impart to [the official] any immunity from responsibility to the supreme authority of the United States." *Young*, 209 U.S. at 160. Because a state cannot authorize a void action, the officer is "stripped of his official or representative character and [is] subjected to the consequences of his official conduct." *Id.*

Of course, limits have been placed on suits brought under *Ex Parte Young*, such as prohibiting retroactive relief, *Pennhurst*, 465 U.S. at 102–03 (citing *Edelman v. Jordan*, 415 U.S. 651, 666–67 (1974)), and barring jurisdiction in cases that allege a state official has violated *state* law, *Pennhurst*, 465 U.S. at 106 ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.").

Three basic elements make up an *Ex Parte Young* lawsuit. "The suit must: (1) be brought against state officers who are acting in their official capacities; (2) seek prospective relief to redress ongoing conduct; and (3) allege a violation of federal, not state, law." *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 736 (5th Cir. 2020) (citing *NiGen Biotec, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015)). Further, an *Ex Parte Young* action must seek

only equitable relief—relief that is "declaratory or injunctive in nature and prospective in effect." *Id.* (quoting *Aguilar v. Tex. Dep't of Crim. Just.*, 160 F.3d 1052, 1054 (5th Cir. 1998)).

The homeowners bring this lawsuit (1) against Bush in his official capacity as Commissioner of the GLO, (2) seeking only declaratory and injunctive relief to redress allegations of ongoing conduct, and (3) address purported violations of the homeowners' Fourth, Fifth, and Fourteenth Amendment rights. Accordingly, the suit complies with the minimum elemental requirements of *Ex Parte Young*.

## III.   Motion to Dismiss

The Commissioner moves to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Dkt. 19. The court addresses each in turn.

### A. 12(b)(1)

#### 1.   Fourth Amendment, Fifth Amendment, and "Substantive Due Process" Claims

Rule 12(b)(1) authorizes dismissal of an action for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Because it "spring[s] from the nature and limits of the judicial power of the United States and is inflexible and without exception," subject-matter jurisdiction is a "threshold" matter. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). "In general, where subject matter jurisdiction is being challenged, the trial court

is free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case." *Montez v. Dep't of Navy*, 392 F.3d 147, 149 (5th Cir. 2004) (citation omitted). In reviewing a motion under 12(b)(1), a court may consider "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).

"However, in cases where the basis of the federal jurisdiction is also an element of the plaintiff's federal cause of action, the United States Supreme Court has set forth a strict standard for dismissal for lack of subject matter jurisdiction." *Clark v. Tarrant Cnty., Tex.*, 798 F.2d 736, 741 (5th Cir. 1986). "Where the factual findings regarding subject matter jurisdiction are intertwined with the merits," federal courts apply the standard as set out in *Bell v. Hood*, 327 U.S. 678 (1946). *Id.* at 742. The *Bell* standard prohibits district courts from dismissing for lack of subject-matter jurisdiction unless one of two exceptions applies—the alleged claim "appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Id.* at 741 (quoting *Bell*, 327 U.S. at 681–82). The rationale is twofold: "Judicial economy is best promoted when the existence of a federal right is directly reached and, where no claim

is found to exist, the claim is dismissed on the merits." *Williamson*, 645 F.2d at 415. Moreover, this method provides "a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim" and whose allegations will be taken as true under a Rule 12(b)(6) motion instead. *Id.* at 415–16.

"There is no clear test for when the 'intertwined with the merits' exception applies." *In re S. Recycling, L.L.C.*, 982 F.3d 374, 380 (5th Cir. 2020). Courts are counseled to "look instead to the *extent* to which the jurisdictional question is intertwined with the merits, considering such factors as whether the statutory source of jurisdiction differs from the source of the federal claim and whether judicial economy favors early resolution of the jurisdictional issue." *Id.* Another consideration is where "the jurisdictional issue can be extricated from the merits." *Id.* (quoting *Williamson*, 645 F.2d at 416 n.10).

If the district court determines that the basis of federal jurisdiction is in fact "intertwined with the plaintiff's federal cause of action," and neither *Bell* exception applies, "the court should assume jurisdiction over the case and decide the case on the merits" through a Rule 12(b)(6) or Rule 56 motion. *Clark*, 798 F.2d at 742 (citing *Williamson*, 645 F.2d at 415); *see Montez*, 392 F.3d at 150.

12/44

Here, the court finds that the jurisdictional question is intertwined with the merits of the homeowners' Fourth Amendment, Fifth Amendment, and "substantive due process" claims. The homeowners contend that the Commissioner has violated their constitutional rights under color of state law in violation of 42 U.S.C. § 1983. And they have invoked federal-question jurisdiction pursuant to 28 U.S.C. § 1331. The Fifth Circuit stated that such a case "is a classic example of a case in which the federal cause of action and federal jurisdiction are interdependent." *Eubanks v. McCotter*, 802 F.2d 790, 793 (5th Cir. 1986).

Here, jurisdiction and the merits are intertwined because resolution of the homeowners' claims hinges on whether the Order amounts to a violation of the homeowners' constitutional rights. The homeowners contend that the Order appropriates an easement, resulting in a Fifth Amendment taking, a Fourth Amendment seizure, and violations of their Fourteenth Amendment "substantive due-process" rights. The Commissioner disagrees, arguing that the homeowners have suffered no legally cognizable injury. Dkt. 19 at 11 (arguing that the Order "does not invade a legally protected interest because it does not establish a public right to access"). The Order, the Commissioner contends, does not "attempt to create or enforce an easement . . . and it would not be possible for an order like this to do so." *Id.* at 12.

If the homeowners' factual assertions are true, they have stated viable constitutional claims and the court has subject-matter jurisdiction. If the homeowners' assertions are not true, the homeowners' constitutional claims fail, leaving no basis for federal jurisdiction. Consequently, the court is "faced with a situation where 'the challenge to the court's jurisdiction is also a challenge to the existence of a cause of action'—in other words, where factual issues determinative of jurisdiction are intertwined with or identical to factual issues determinative of the merits." *Worldwide Parking, Inc. v. New Orleans City*, 123 F. App'x 606, 608 (5th Cir. 2005) (quoting *Williamson*, 645 F.2d at 415).

The court finds that disposition of the jurisdictional issue would require ruling on the merits of the homeowners' constitutional claims. *See, e.g., United States v. One 1998 Mercury Sable Vin: 1MEMF5OU4WA621967*, 122 F. App'x 760, 763 (5th Cir. 2004). Thus, the only question remaining is whether the homeowners' claims "clearly appear[] to be immaterial and made solely for the purpose of obtaining jurisdiction" or if such claims are "wholly insubstantial and frivolous." *Bell*, 327 U.S. at 682–83. The Fifth Circuit has said this standard "is met only where the plaintiff's claim 'has no plausible foundation' or 'is clearly foreclosed by a prior Supreme Court decision.'" *Williamson*, 645 F.2d at 416

(citation omitted). This case does not fall within either of those exceptions. Accordingly, the court denies the Commissioner's request to dismiss the homeowners' Fourth Amendment, Fifth Amendment, and "substantive due process" claims under Rule 12(b)(1).

### 2.    "Procedural Due Process" Claim

The homeowners' "procedural due process" claim requires a distinct jurisdictional inquiry because that alleged injury is not that the Order appropriated an easement, but that the Order deprived the homeowners of notice and a hearing before imposing repair and construction restrictions on their properties. *See* Dkt. 30 at 28. Under Fifth Circuit precedent, a "procedural due process" claim that is brought concurrently with a takings claim should be analyzed according to "general ripeness principles." *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 223 (5th Cir. 2012) (quoting *Rosedale Missionary Baptist Church v. New Orleans City*, 641 F.3d 86, 90 (5th Cir. 2011)). Courts use a two-prong approach, considering "(1) the fitness of the issue for judicial decision and (2) the hardship to the parties of withholding court consideration." *Bowlby*, 681 F.3d at 224 (quoting *Rosedale Church*, 641 F.3d at 91).

The Fifth Circuit has distinguished between "procedural due process" claims that involve allegations of deprivations "ancillary" to or "arising from"

a takings claim from those claims "whose main thrust . . . is not a claim for a taking." *Bowlby*, 681 F.3d at 223–24 (quoting *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1045 n.6 (5th Cir. 1998)). "The ripeness of the former depends on the ripeness of the 'ancillary' takings claim, while the ripeness of the latter is a separate matter from the ripeness of any attendant takings claim." *Bowlby*, 681 F.3d at 224.

*Bowlby* involved a city's revocation of a businesswoman's permits to operate a "Sno Cone" hut on the edge of town. *Id.* at 218. The Fifth Circuit held that the plaintiff had pleaded a "separately cognizable" claim when she complained that process was due before the city could revoke her permits and that the resulting revocation destroyed her business. *Id.* at 225. This injury, the court held, challenged the permitting decision "'in isolation, as a single decision with its own consequences, rather than as one in a series of . . . actions resulting in a taking.'" *Id.* (quoting *Hidden Oaks*, 138 F.3d at 1045 n.6). Similarly, the homeowners allege that the Order deprived them of notice before imposing "repair and construction restrictions on properties in the 200[-]foot easement area." This, the homeowners argue, harms their "rights in the use, value, repair, [and] exclusivity and marketability of their properties." Dkt. 30 at 28–29. The court thus finds that the homeowners' "procedural due process" claim pleads an injury distinct from an

uncompensated taking.

Turning now to general ripeness principles, the court further finds that the issue is fit and ready for a judicial determination. The homeowners allege an injury separate from any potential taking, and the determination of whether a taking occurred would not affect the issue of whether the Order imposes repair and construction restrictions on the properties without due process. *See Archbold-Garrett v. New Orleans City*, 893 F.3d 318, 323 (5th Cir. 2018). Further, the homeowners have credibly alleged that withholding consideration of their "procedural due process" claim could cause them further hardship as the OBA provides no recourse that would allow them to repair their homes as they see fit in light of the restrictions imposed. Accordingly, the court finds the homeowners' "procedural due process" claim is ripe.

### B. 12(b)(6)

Review of whether a complaint fails to state a claim under Rule 12(b)(6) involves a different set of considerations than a Rule 12(b)(1) motion. A 12(b)(6) motion should be granted only if the complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In analyzing a 12(b)(6) motion, the court accepts all well-pleaded facts as true, viewing them in the

light most favorable to the nonmoving party. *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004). The court's review is limited to the allegations in the complaint and to those documents attached to a motion to dismiss to the extent that those documents are referred to in the complaint and are central to the claims. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).

To survive a 12(b)(6) motion, "a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor,* 503 F.3d 397, 401 (5th Cir. 2007) (footnote omitted) (quoting *Twombly,* 550 U.S. at 555). "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Id.* (quoting *Twombly,* 550 U.S. at 558).

### 1.      Fifth Amendment Taking

The Takings Clause of the Fifth Amendment prohibits uncompensated takings of private property. U.S. Const. amend. V. The "paradigmatic" example of a taking requiring just compensation is "direct government appropriation or physical invasion of private property." *Lingle v. Chevron*

18/44

*U.S.A. Inc.*, 544 U.S. 528, 537 (2005). Recently, the Supreme Court formally embraced another type of *per se* taking: when an "access regulation appropriates a right to invade" one's property. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).

In *Cedar Point*, a California regulation granted union organizers a "right to take access" to an agricultural employer's property to solicit support for unionization. *Id.* at 2069 (citing Cal. Code Regs., tit. 8, § 20900(e)(1)(C) (2020)). The employers were required to allow union organizers onto their property for up to three hours per day, 120 days per year. *Id.* The Court held that the "access regulation appropriates a right to invade the growers' property and therefore constitutes a *per se* physical taking." *Id.* at 2072. While government action stemming from regulations have often been classified as "regulatory takings" requiring analysis under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), the *Cedar Point* Court held that "government action that physically appropriates property is no less a physical taking because it arises from a regulation." 141 S. Ct. at 2072. The essential question is not whether the governmental action "comes garbed as a regulation (or statute, or ordinance, or miscellaneous decree)" but "whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property

owner's ability to use his own property." *Id.* (citing *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321–23 (2002)).

The homeowners have sufficiently alleged a *per se* taking under *Cedar Point*. Through both facial and as-applied challenges to the constitutionality of the Order, the homeowners charge the Order authorizes "ongoing public use and occupation of every area of private beach land to which it applies" and also "eviscerates [their] right to exclude unwanted members of the general public from private land." Dkt. 12 ¶¶ 92–94. Specifically, the homeowners contend that by declaring that "[t]he area from MLT to 200 feet landward shall be the minimum public beach easement," the Order "converts every area of private dry beach lands at Surfside Beach to which the Order applies into public property for at least two years." *Id.* ¶ 89. This, the homeowners maintain, is an appropriation of a public easement without compensation in violation of the Fifth Amendment. Dkt. 12 ¶¶ 86–98.

The Commissioner argues, however, that to amount to a *per se* taking "the state agency must attempt to take possession of the property or otherwise physically occupy or appropriate the property." Dkt. 19 at 17. But nothing in *Cedar Point* requires that a state agency physically occupy the real estate. On the contrary, *Cedar Point* requires only that the "regulation

appropriates a right to physically invade" private property by members of the public. *Cedar Point*, 141 S. Ct. at 2074.

The Commissioner also insists the homeowners have not lost their right to exclude members of the public from their private properties, arguing that any "public beach and related signage restrictions are limited to and recognized in areas only where the rights [to access] had already been acquired." Dkt. 19 at 18. At best, the Commissioner argues, the Order is an "administrative determination of [the homeowners'] lots' physical position on the beach in relation to the temporary LOV." *Id.* But this argument fails to acknowledge the plain language of both the Order and the "FAQ" page the GLO provided to the homeowners when the Order went into effect. Among other things, the FAQ states "[t]he establishment of the LOV at 200 feet from mean low tide line will mean that a limited number of homes are now partially or wholly located on the public beach." Dkt. 12-3 at 2. Read in conjunction with the OBA, the homeowners argue the Order "negates the owners' right to exclude" by preventing signage or barriers on the "public beach." Dkt. 30 at 25; *see* Tex. Nat. Res. Code §§ 61.0171(a); 61.018(a) (allowing enforcement of the OBA to "remove or prevent any improvement, maintenance, obstruction, barrier, or other encroachment on a public beach, or to prohibit any unlawful restraint on the public's right of access to and use

of a public beach or other activity"). Taking the homeowners' allegations as true, the court finds that they have sufficiently pleaded a plausible claim that the Order "appropriates for the enjoyment of third parties the owners' right to exclude." *Cedar Point*, 141 S. Ct. at 2072.

Next, the Commissioner argues that the homeowners' pleadings still fail to sufficiently allege a taking because property rights are established under state law, not federal law. Dkt. 19 at 19. Though the court agrees that the property rights at stake arise under state law, that fact gets the Commissioner nowhere; the homeowners seek to protect their state-law-derived property rights, not obtain new rights through a federal claim. Indeed, the *Cedar Point* Court addressed this exact argument, holding the government "cannot absolve itself of takings liability by appropriating the . . . right to exclude in a form that is a slight mismatch from state easement law." 141 S. Ct. at 2076.

Nevertheless, the GLO argues that the homeowners' Fifth Amendment claim fails because the proper remedy for a taking is compensation—not equitable relief. Dkt. 19 at 19. For support, the GLO relies on both *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984), and *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019). But neither *Ruckelshaus* nor *Knick* prohibits a litigant from bringing a claim for equitable relief under *Ex Parte*

*Young* for violations of the Fifth Amendment Takings Clause against a state agency when monetary relief is unavailable in federal court.[3] Instead, the court finds instructive cases where litigants properly brought takings actions under *Ex Parte Young* and sought prospective, equitable relief in federal court. *See, e.g.*, *Severance v. Patterson*, 56 F.3d 490, 495 (5th Cir. 2009) (holding that a suit seeking prospective equitable relief to determine whether the State may constitutionally impose an easement was not barred by sovereign immunity); *Plaisance v. Louisiana*, Civ. Action No. 21-00121-BAJ-EWD, 2021 WL 2046699, at *1, *3 (M.D. La. May 21, 2021) (permitting a takings action against state official for prospective relief); *Miss. Surplus Lines Ass'n v. Mississippi*, 384 F. Supp. 2d 982, 986–87 (S.D. Miss. 2005) (same).

Finally, the court notes that the Commissioner points to no

---

[3] The *Ruckelshaus* Court held "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." 467 U.S. at 1016. As *Ruckelshaus* dealt with provisions of the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq.*, administered by the Environmental Protection Agency and for which damages were available under the Tucker Act, 28 U.S.C. § 1491, equitable relief was therefore foreclosed in federal court. *Id.* at 1019; *accord Knick,* 139 S. Ct. at 2173 (stating that equitable relief was unavailable in *Ruckelshaus* because "monetary relief was under the Tucker Act"). Similarly, in *Knick*, the court faced a takings claim against a municipality not protected by sovereign immunity and thus subject to claims for monetary damages in federal court. *Knick*, 139 S. Ct. at 2168–69. When monetary damages are available, the *Knick* Court opined, in what is arguably *obiter dictum*, "injunctive relief will be foreclosed." *Id.* at 2179.

background restrictions on the homeowners' property which would authorize any alleged physical invasion or foreclose a finding of a physical taking. *See Cedar Point*, 141 S. Ct. at 2079.

Accordingly, the court finds the homeowners have pleaded sufficient facts to allege a plausible claim for a Fifth Amendment taking. The Commissioner is not entitled to dismissal of this claim.

### 2.    Fourth Amendment Seizure

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

In *Severance v. Patterson*, the Fifth Circuit upheld a Fourth Amendment seizure claim when a homeowner asserted an "appropriation of an easement over beachfront land not previously so encumbered," which was "unreasonable because the interference is unjustified by state law or, if justified, then uncompensated." 566 F.3d at 502 (citing *Presley v. City of Charlottesville*, 464 F.3d 480, 487–88 (5th Cir. 2006)). As the homeowners here have pleaded nearly identical facts, *see* Dkt 12 ¶¶ 108–14, the court finds

their pleadings are sufficient to state a claim for relief that is plausible on its face.

The Commissioner argues that *Severance* is distinguishable because there, unlike here, imminent removal of the plaintiff's home provided the factual basis for a colorable Fourth Amendment seizure claim. But the *Severance* Court did not discuss the imminence of the home's removal when conducting its 12(b)(6) analysis. *See Severance*, 566 F.3d at 501–02. Instead, the court held the allegations of an "appropriation of an easement" were sufficient because the consequence of such an easement was the plaintiff's inability to repair her damaged home or exclude the public from her property. *Id.*

Because the alleged "appropriation of an easement" has been held enough to constitute a "meaningful interference" under the Fourth Amendment, the homeowners have pleaded sufficient facts to constitute a plausible claim for relief. The Commissioner is not entitled to dismissal of this claim.

### 3.    "Procedural Due Process"

The Fourteenth Amendment of the U.S. Constitution prohibits a state from depriving a person "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Procedural due process" guarantees are

invoked when a state actor deprives an individual of a protected life, liberty, or property interest. *Baldwin v. Daniels*, 250 F.3d 943, 946 (5th Cir. 2001). The government must provide reasonable notice to an individual of its intention to deprive him of such an interest, *Mullane v. Cen. Hanover Bank & Trust Co.*, 339 U.S. 306, 313–15 (1950), and afford that individual a meaningful opportunity to be heard, *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976). To prevail on a "procedural due process" claim, plaintiffs must show "(1) they possess a property interest that is protected by the due process clause, and (2) that the defendant's procedures are constitutionally inadequate." *Ridgely v. FEMA*, 512 F.3d 727, 734 (5th Cir. 2008).

The Commissioner argues that the homeowners have failed to allege a sufficient deprivation of property because the Order does not appropriate an easement. But the homeowners allege a distinct injury for their "procedural due process" claim: their inability to make certain repairs on their property. *See Archold-Garrett*, 893 F.3d at 323 (holding that economic injuries from homeowner's "constrained ability to redevelop the property" was a separate cognizable injury). And because a "procedural due process" claim is distinct from the takings claim, it is irrelevant that under takings precedent pre-deprivation notice is not required under the Fifth Amendment's Just Compensation Clause. *See* Dkt. 19 at 21 (citing *Williamson County*, 473 U.S.

at 195 n.14).

Notwithstanding the foregoing, the Commissioner argues that the homeowners "had notice that the LOV could be set at 200 feet from mean low tide . . . since 2013" when § 61.0171(a) was enacted. Dkt. 19 at 21. But this constructive-notice argument fails. In *Small Engine Shop, Inc. v. Cascio*, 878 F.2d 883 (5th Cir. 1989), the Fifth Circuit considered whether the enactment of a statute could satisfy the Due Process Clause's guarantee of an opportunity to be heard. Ultimately, the Court held that while property owners are presumed to have "knowledge of relevant statutory provisions affecting the control or disposition of their property," *Texaco, Inc. v. Short*, 454 U.S. 516, 517 (1982), it did not follow that the burdens imposed on the government under *Mullane* are entirely shifted to the property owners every time a statute is enacted. *Small Engine*, 878 F.2d at 889–90. "Facts matter, and factual matrices differ." *Id.* at 890. Here, the Commissioner provides no reason for the court to presume the burden of notice was entirely shifted to the homeowners after 2013 when § 61.0171 was enacted. This is especially concerning where the statute makes no mention of a homeowners' inability to make certain repairs during the period covered by a resultant temporary order. *See* Tex. Nat. Res. Code § 61.0171 *et seq*. Without more, the court is not prepared to hold that the statute itself provided the homeowners

constitutionally sufficient notice before any alleged deprivation. Accordingly, the Commissioner is not entitled to a dismissal of the homeowners' "procedural due process" claim.

### 4.    "Substantive Due Process"

The homeowners' "substantive due process" claim "challenges the establishment of the 200[-]foot line as the 'public beach' boundary." Dkt. 30 at 29. They argue that setting the public-beach boundary at 200 feet is arbitrary and that authorizing an easement on private land 200 feet from the MLT is "arbitrary and illegitimate because it is occurring without prior proof of the existence of a common[-]law public easement." *Id.*

To prevail on a "substantive due process" claim, plaintiffs "must first establish that [they] held a constitutionally protected property right to which the Fourteenth Amendment's due process protection applies." *Simi Inv. Co., Inc. v. Harris Cnty., Tex.*, 236 F.3d 240, 249–50 (citing *Spuler v. Pickar*, 958 F.2d 103, 106 (5th Cir. 1992)). And in a case concerning Texas real property, the nature of the property interest must be determined by Texas law. *Simi*, 958 F.2d at 106 (citing *Spuler*, 958 F.2d at 106). This first issue is resolved in the homeowners' favor. *See Severance*, 370 S.W.3d at 713 ("[T]he right to exclude others from privately owned realty is among the most valuable and fundamental of rights possessed by private property owners.").

The court next must determine whether the requirements of the Order are "rationally related to a legitimate governmental interest." *Simi*, 236 F.3d at 251 (citation omitted). "The question is only whether a rational relationship exists between the [policy] and a conceivable legitimate objective. If the question is at least debatable, there is no substantive due process violation." *Id.* (citation omitted). The court finds that the homeowners have failed to overcome this burden. The factual allegations do not show that the official conduct in this case is so arbitrary that it lacks any rational relationship to the State's goals of promoting public access to public beaches. The homeowners' "substantive due process" claim is dismissed.

### C. Abstention

Once a federal court determines that jurisdiction has been conferred over a matter, it generally cannot abstain from exercising that jurisdiction. *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 358 (1989) ("*NOPSI*"). However, in "extraordinary and narrow" circumstances, a district court "may decline to exercise or postpone the exercise of its jurisdiction." *Allegheny Cnty. v. Frank Mashuda Co.*, 360 U.S. 185, 188–89 (1959). Such circumstances include instances where "difficult and unsettled questions of state law must be resolved before a substantial

federal constitutional question can be decided" (*Pullman* abstention),[4] or when the court wants to protect complex state administrative processes from undue federal interference (*Burford* abstention).[5] The Commissioner asks the court to abstain from the merits of the case under both the *Pullman* and *Burford* doctrines. Neither applies.

### 1.    *Pullman* Abstention

*Pullman* abstention is a judicially created doctrine which delays the exercise of federal jurisdiction "to clarify ambiguous state law issues when resolution of such issues might eliminate or substantially modify a federal constitutional question." *Stephens v. Bowie Cnty., Tex.,* 724 F.2d 434, 435 (5th Cir. 1984). "By abstaining in such cases, federal courts will avoid both unnecessary adjudication of federal questions and 'needless friction with state policies. . . .'" *Midkiff*, 467 U.S. at 236 (quoting *Pullman*, 312 U.S. at 500).

The Fifth Circuit has held that a federal court may abstain under the *Pullman* doctrine if one of the following three factors is present: (1) the disposition of a question of state law can eliminate or narrow the scope of the federal constitutional issue; (2) the state-law question presents difficult,

---

[4] *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984) (citing *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941)).

[5] *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

obscure, or unclear issues of state law; or (3) a federal decision could later conflict with subsequent state-court resolutions concerning the same regulatory program or scheme, seeding more confusion. *Stephens*, 724 F.2d at 436.

More recently, the Fifth Circuit has used a slightly different two-pronged approach. In *Nationwide Mutual Insurance Co. v. Unauthorized Practice of Law Committee*, the court ruled that *Pullman* abstention is appropriate in cases involving "(1) a federal constitutional challenge to state action and (2) an unclear issue of state law that, if resolved, would make it unnecessary for [the court] to rule on the federal constitutional question." 283 F.3d 650, 653 (5th Cir. 2002). The common thread running through both approaches is whether "there is an issue of uncertain state law that is fairly subject to an interpretation" by a state court. *Moore v. Hosemann*, 591 F.3d 741, 745 (5th Cir. 2009) (quoting *Baran v. Port of Beaumont Navigation Dist.*, 57 F.3d 436, 442 (5th Cir. 1995)). Notably, "*Pullman* does not command district courts to abstain simply to permit state review of an unambiguous statute that has previously never been interpreted by a state court." *Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 145 F.3d 238, 243 (5th Cir. 1998) (citing *Houston v. Hill*, 482 U.S. 451, 469 (1987)).

Applying the *Nationwide* test, the first prong is met here because the

homeowners challenge the Commissioner's official action on federal constitutional grounds. *See, e.g.*, *Moore*, 591 F.3d at 745 (challenge to Mississippi Secretary of State's conduct constituted official action).

The second prong is where the Commissioner runs into problems. The government states that *Severance* "unsettled state law by overturning prior court decisions" that allowed rolling easements. Dkt. 19 at 27. Because § 61.0171 was enacted the year after *Severance* was decided, the Commissioner argues that how the new provision interplays with *Severance*, the Texas Constitution, the rest of the OBA, and the Texas Dune Protection Act[6] "must be resolved before considering the federal claims in this case." *Id.* The court disagrees.

First, as the court knows of no ongoing, parallel state action on any similar issue, the federalism concerns that compel *Pullman* abstention are missing. *See* 17A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 4242 (3d ed. 2020) ("Pullman-type abstention is based in large part on considerations of federalism, and the desire to preserve harmonious federal-state relations."); *see, e.g.*, *Moore v. Tangipahoa Parish Sch. Bd.*, 507 Fed. App'x 389, 395 (5th Cir. 2013) (*Pullman* abstention appropriate where a parallel state-court action

---

[6] Tex. Nat. Res. Code §§ 63.001 *et seq.*

challenged the validity of the same program under the Louisiana constitution); *Parm v. Shumate*, 73 Fed. App'x 78 (5th Cir. 2003) (upholding district court's decision to abstain pending resolution of state-law litigation).

The claims alleged here rest "wholly on rights guaranteed by the federal Constitution." *Tex. Entm't Ass'n, Inc. v. Hegar*, 10 F.4th 495, 508 (5th Cir. 2021). While the Commissioner raises alarm at the prospect of *Severance* implicating other sources of state law, "that fact in and of itself does not bring this case within the limited scope of *Pullman* abstention." *Id.*

Moreover, for the notion that "unsettled questions of the application of the *Severance* opinion . . . must be resolved before considering the federal claims in this case," Dkt. 19 at 27, the Commissioner relies on a single case from an intermediate Texas appeals court that was dismissed for a lack of subject-matter jurisdiction. *See Pedestrian Beach, LLC v. State*, No. 01-17-00870-CV, 2019 WL 6204838, at *11 (Tex. App.—Houston [1st Dist.] Nov. 21, 2019, no pet.). The supposed "unsettled questions" that so concern the Commissioner come up only in two opinions by concurring justices who clearly believe *Severance* was wrongly decided. *See id.* at *11-16 (Keyes, J., concurring); *see also id.* at *16 (Goodman, J., concurring). But whether *Severance* was correctly decided or not, it has been Texas law for ten years. The only court that can change that is the Court that decided it, and so far it

has shown no inclination to do so.

In sum, without a clear explanation of the difficult or unsettled question of state law that must be resolved, the court finds that the strictures of the *Pullman* doctrine are unsatisfied and declines to abstain.

### 2.      *Burford* Abstention

Federal courts have a "virtually unflagging obligation" to exercise their jurisdiction. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). "District courts may only abstain in the rare instances when hearing a case within [its] equity jurisdiction would 'be prejudicial to the public interest.'" *Grace Ranch, L.L.C. v. BP Am. Prod. Co.*, 989 F.3d 301, 313 (5th Cir. 2021) (*quoting Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943)). Abstention under the *Burford* doctrine "allows federal courts to avoid entanglement with state efforts to implement important policy programs." *Id.* In *Grace Ranch*, the Fifth Circuit recently reiterated the rare nature of *Burford* abstentions: "The power to abstain under *Burford* charges courts with a careful balancing of state and federal interests, but one that 'only rarely favors abstention.'" *Id.* (quoting *Quackenbush*, 517 U.S. at 728)).

The Fifth Circuit employs a five-factor test to determine whether *Burford* abstention is warranted:

> (1) whether the cause of action arises under federal or state law;
> (2) whether the case requires inquiry into unsettled issues of

state law or into local facts; (3) the importance of the state interest involved; (4) the state's need for a coherent policy in that area; and (5) the presence of a special state forum for judicial review.

*Wilson v. Valley Elec. Membership Corp.*, 8 F.3d 311, 314 (5th Cir. 1993). A district court's decision to abstain is reviewed for abuse of discretion, but whether the requirements of a particular abstention doctrine are met is reviewed *de novo*. *Grace Ranch*, 989 F.3d at 313.

The first factor clearly weighs against abstention; all the homeowners' claims are federal constitutional claims.

The second factor also weighs against abstention. As explained above, even though no court has yet had occasion to construe § 61.0171, it is not a given that this case raises any unsettled issues of state law. And the mere fact that a case requires a federal court to speak on a state statute is not enough to compel abstention. *See Moore v. State Farm Fire & Cas. Co.*, 556 F.3d 264, 272 (5th Cir. 2009) (declining to abstain just because an "action arises under state law and requires an inquiry into unsettled state-law issues"); *Grace Ranch*, 989 F.3d at 315 ("We frequently decide unsettled questions of state law . . . . Indeed, the certification procedure arose in response to our court being too quick to abstain.").

The third factor favors the Commissioner because Texas undoubtedly has a strong interest in the use and preservation of its beaches. But this factor

weighs heavily in favor of abstention only "when the state interests at stake are 'paramount.'" *Grace Ranch*, 989 F.3d at 316 (quoting *Quakenbush*, 517 U.S. at 728). Such is the case when a "state administrative scheme guards an 'over-all plan of regulation . . . of vital interest to the general public' from federal interference." *Id.* Abstention has also been found proper when "countervailing federal policies undermine the primacy of the state's interests," or "when the state interests involved are not threatened by the limited relief sought." *Id.* (internal citations omitted).

The fourth factor, the state's need for a coherent policy in the area at issue, would also seemingly favor the Commissioner. Texas has an entire statutory scheme, the OBA, dedicated to access to public beaches. *See* Tex. Nat. Res. Code § 61.011 *et seq*. But the Commissioner has not sufficiently explained how the narrow relief the homeowners seek in this case would upend that scheme. *See Grace Ranch*, 989 F.3d at 318 ("Whatever the result of Grace Ranch's case, the Commissioner will remain free to enforce the same law for other land in the state."); *Stratta v. Roe*, 961 F.3d 340, 358 (5th Cir. 2020) (holding abstention unwarranted when "the state concerns that are implicated are not overriding in light of the remedy sought").

Finally, the fifth factor leans against abstention. As "there is no special state forum for judicial review," *Romano v. Greenstein*, 721 F.3d 373, 280

(5th Cir. 2013), this case does not feature the type of "'complex state administrative processes' that *Burford* abstention aims to 'protect[] . . . from undue federal interference.'" *Grace Ranch*, 989 F.3d at 317 (quoting *NOPSI*, 491 U.S. at 362).

In sum, the court finds that as this case does not present one of "the rare instances" calling for *Burford* abstention, *Grace Ranch*, 989 F.3d at 313, it again declines to abstain.

## IV.   Motion for a Preliminary Injunction

"Generally, a movant must satisfy each of four traditional criteria in order to be entitled to a preliminary injunction: (1) irreparable injury[,] (2) substantial likelihood of success on the merits, (3) a favorable balance of hardships, and (4) no adverse effect on the public interest." *Black Fire Fighters Ass'n of Dallas v. City of Dallas*, 905 F.2d 63, 65 (5th Cir. 1990) (per curiam). "A preliminary injunction is an extraordinary remedy that should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012) (quotation marks and citation omitted). None of these elements may be presumed; each must be established separately. *Plains Cotton Coop. Ass'n of Lubbock, Tex. v. Goodpasture Computer Serv., Inc.*, 807 F.2d 1256, 1261 (5th Cir. 1987).

The homeowners insist that simply because they have shown a constitutional violation, they have established irreparable harm. *See* Dkt. 16 at 29. But the court is not yet convinced that such a violation has been shown. Moreover, as the Commissioner points out, Dkt. 31 at 24, the cases on which the homeowners rely for this idea are both based on *Elrod v. Burns*, 427 U.S. 347 (1976), in which the Court held that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 373. The Commissioner adds that the Fifth Circuit has yet to apply *Elrod* "outside of a First Amendment context." Dkt. 31 at 24. The court finds that the homeowners' allegation that their constitutional rights have been violated is not enough, taken alone, to establish an irreparable injury. *See Lambert v. Bd. of Comm'rs of Orleans Levee Dist.*, No. 05-5931, 2006 WL 8456316, at *7 (E.D. La. Mar. 22, 2006) ("A number of courts have expressly declined to find that the irreparable[-]harm requirement for injunctive relief is automatically satisfied by a plaintiff's allegation that his constitutional rights have been violated.")

The homeowners also urge the court to issue a preliminary injunction because their "privacy is at serious risk because the Order authorizes members of the public to use the land on which their homes sit." Dkt. 16 at 29. They argue that without an injunction, they are "at risk of being sued or

otherwise held liable for any injuries to members of the public [who] attempt to enter and use their developed land for purposes of access a 'public beach.'" *Id.* at 30. And the Order also bars the homeowners from making certain repairs and improvements that "may be essential to their continued rental use and to [protect] from storms." *Id.* Finally, the homeowners argue that the Order "creat[es] an official encumbrance on title that will continue to burden their rights" if an injunction does not issue. Dkt. 16 at 37–38. None of these reasons convince the court that the homeowners are at risk of suffering irreparable harm.

To merit injunctive relief, a party must show a *likelihood* of irreparable harm. *Cf. Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21–22 (2008) (noting that a preliminary injunction may not issue on only the *possibility* of irreparable harm, but instead requires that "irreparable injury is likely in the absence of an injunction"). Such a showing requires more than mere speculation. *See United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001) ("[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. A presently existing actual threat must be shown.").

First, the court notes that the Fifth Circuit has not spoken on whether a threat to privacy constitutes an "irreparable injury" for purposes of a

preliminary injunction. *See Dennis Melancon*, 703 F.3d at 280 n.15 (declining to address whether the violation of the plaintiffs' right to privacy could form the basis of a claim of irreparable injury). And even if an invasion of their privacy could form the basis of an irreparable injury, the homeowners have not shown that their fears are more than mere speculation. *See Emerson*, 270 F.3d at 262.

The homeowners also fear that members of the public will encroach onto their private property now that it is deemed part of the public beach. But the fear of an army of trespassers is hypothetical at this point. "There must be a *likelihood* that irreparable harm will occur. Speculative injury is not sufficient; there must be more than unfounded fear on the part of the applicant." *Emerson*, 270 F.3d at 262 (quoting 9 WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 2948.1 at 153–56). For the same reason, the homeowners' fear of being held legally liable for any lawsuits arising from injuries on their property is too speculative. And the homeowners' allegations that their inability to make certain improvements on or repairs to their properties may cause a reduction in rental income or protection from storms do not amount to a "clear showing" that such a series of events will happen at all. *Winter*, 555 U.S. at 22; Dkt. 16 at 30.

Finally, the court addresses whether the Order itself constitutes

irreparable injury. The homeowners rely on *Opulent Life Church v. City of Holly Springs, Mississippi*, for the proposition that "'[t]he deprivation of an interest in real property constitutes irreparable harm.'" 697 F.3d 279, 297 (5th Cir. 2012) (quoting *Third Church of Christ, Scientist, of N.Y.C. v. City of New York*, 617 F. Supp. 2d 201, 215 (S.D.N.Y. 2008), *aff'd*, 626 F.3d 667 (2d Cir. 2010)). But that case and this one are not on all fours.

In *Opulent Life*, a case brought under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), a religious congregation sought to enjoin the enforcement of a municipal zoning ordinance that applied only to churches. 697 F.3d at 281–82. Opulent Life Church had leased a building, on the courthouse square in Holly Springs, Mississippi, for its growing congregation. *Id.* at 282–83. By its terms, the lease would not take effect until the church obtained the proper land-use and building-renovation permits from Holly Springs. *Id.* at 283. But the city refused to grant the permits because Opulent Life had failed to meet the church-specific zoning requirements. *Id.*

In holding that "'[t]he deprivation of an interest in real property constitutes irreparable harm,'" *id.* at 297, the Fifth Circuit did two things. First, it specifically noted that the deprivation was the loss of the lease, *id.* at 297, which would leave the church with no adequate space to worship and

carry out its community-service programs, *id.* at 282. In other words, the deprivation of an interest in real property that the church would suffer would be a complete deprivation—it would be completely unable to make use of the real property at issue.

The second thing the Fifth Circuit did is quote directly from another RLUIPA case in which another church faced a similar fate. In *Third Church of Christ, Scientist, of New York City v. City of New York*, a religious congregation with declining membership and an aged building in desperate need of repair signed a lease with a catering company to use portions of the church building when not in use by the congregation. 617 F. Supp. 2d at 203–04. At first the city permitted this use, but later revoked the permission. *Id.* at 204–05. The church sued and sought injunctive relief against the city. *Id.* at 208. And in finding that there was "no question" the church faced irreparable harm, the court noted that the church would have to sell its building, which it had occupied for more than eighty years, absent an injunction against the city. *Id.* at 215. Again, the threatened deprivation of an interest in real property was a *complete* deprivation.

In both *Opulent Life* and *Third Church of Christ, Scientist*,[7] churches

---

[7] The homeowners cite two more cases for the idea that the loss of an interest in real property is an irreparable injury: *Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1159 (9th Cir. 2011), and *Golf Village*

suing under the RLUIPA were threatened with a complete deprivation of their ability to use, or even occupy, the pieces of real property on which their places of worship stood. In both cases, the deprivation would leave the churches unable to operate at all. The homeowners in this case have alleged no such complete deprivation. Instead, as set forth above, they fear they will be unable to either exclude the public from their property or to make repairs and improvements. But the homeowners have pointed to no cases showing that such partial "deprivations" amount to irreparable harm. Moreover, the Commissioner has represented that "the GLO does not prohibit 'no trespassing' or 'private property' signs on homes or private walkovers." Dkt. 31 at 19–20. And the Commissioner further notes that the homeowners' repairs and improvements are purely hypothetical—they have submitted no applications for repair or construction permits. *Id.* at 20. The court finds that

---

*North LLC v. City of Powell*, 333 F. Supp. 3d 769, 781 (S.D. Ohio 2018). But like the plaintiffs in *Opulent Life* and *Third Church of Christ, Scientist*, the plaintiffs in *Park Village* feared a complete deprivation of their ability to occupy their real property—they faced eviction. 636 F.3d at 1159. And the plaintiff in *Golf Village* sought to enjoin a continuing trespass by the defendants—a trespass that threatened to include the clearing of trees, the filling of wetlands, the digging of trenches, and the conversion of private roads into public streets. 333 F. Supp. 3d at 781. The homeowners face nothing of that sort here. Moreover, the court in *Golf Village* noted that courts are less willing to recognize the deprivation of an interest in real property as irreparable harm when the property is commercial real estate or investment property rather than the plaintiff's residence. *Id.* at 780–81. As noted above, the homeowners in this case do not live in the properties at issue; rather, they use them as vacation rentals.

such speculative incursions on property rights do not amount to irreparable harm.

"The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). Because the homeowners have failed to meet their burden of showing irreparable harm, their motion for a preliminary injunction is denied.

*** *

In sum, the court denies in part and grants in part the Commissioner's motion to dismiss. Dkt. 19. The homeowners' Fifth Amendment, Fourth Amendment, and "procedural due process" claims survive. But their "substantive due process" claim is dismissed. The court further denies the homeowners' motion for preliminary injunction. Dkt. 16.

Signed on Galveston Island this 24th day of May, 2022.

_____
JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE